UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

LARZ A. ELLIOTT,                                     )
          Plaintiff,                          )
                           )
   vs.                                               )          1:08-cv-0480-RLY-JMS
                           )
SHERIFF OF RUSH COUNTY, INDIANA, )
TERRY L. DRAKE, 70-40, RCSD,             )
          Defendants.                       )

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT and
PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

What began as a typical *Terry* stop, initiated by Deputy Terry L. Drake ("Deputy

Drake") for speeding, quickly turned into much more, resulting in Plaintiff's ultimate

arrest for, *inter alia*, possession of marijuana, possession of paraphernalia, and operating

a vehicle while intoxicated.  Plaintiff brings this civil action against Deputy Drake and the

Sheriff of Rush County (the "Sheriff") (collectively "Defendants") under 42 U.S.C. §

1983 ("Section 1983") for violations of his Fourth Amendment rights.  Plaintiff also

brings state law claims against the Sheriff for false arrest, false imprisonment, and

battery.  Both parties move for summary judgment.  For the reasons set forth below, the

court **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary

Judgment, and **DENIES** Plaintiff's Cross-Motion for Partial Summary Judgment.

I.      **Expert Report of Dr. Smith**

Before addressing the facts of this case, the court must first determine whether the expert testimony of Dr. Steven R. Smith ("Dr. Smith"), submitted by Plaintiff, is admissible.  Dr. Smith's testimony is submitted by Plaintiff principally to discredit Deputy Drake's purported observations of Plaintiff's condition at the time of the initial traffic stop as having red/glassy eyes and slightly slurred speech.  Dr. Smith is a board certified medical doctor in occupational and environmental medicine, and has held the position as Director of Occupational Medicine for Community Hospital for twenty-four years.  (Plaintiff's Ex. 12, Testimony of Dr. Steven R. Smith from the Hearing on the Plaintiff's Motion to Suppress ("Dr. Smith Suppression Test.") at 6, 9).  Defendants move to strike Dr. Smith's testimony on three grounds: (1) he was not properly disclosed pursuant to the parties' Amended Case Management Plan, (2) his qualifications to give an expert opinion have not been established; and (3) his opinions are speculative.

A.      **Disclosure Under the Parties' CMP**

The parties' Amended Case Management Plan ("CMP") was approved by the court on June 30, 2008.  (Docket # 25).  Paragraph III.F. of the CMP provides, "[I]f Plaintiff uses expert witness testimony at the summary judgment stage, such disclosures must be made no later than 60 days prior to the summary judgment deadline." Defendants' Motion for Summary Judgment was filed on August 21, 2009; thus, Plaintiff's expert disclosures were due on or before June 21, 2009.

Plaintiff represents that on August 26, 2008, Plaintiff served Defendants his Rule

26 disclosures listing Dr. Smith as a witness, and provided both Dr. Smith's curriculum

vitae ("CV") and his expert opinions outlined in his testimony from the hearing on

Plaintiff's Motion to Suppress.  Plaintiff's notice of service is reflected on the docket.

(Docket # 30).  In addition, on September 15, 2008, Dr. Smith was listed as a witness on

Plaintiff's list of witnesses and exhibits electronically filed and served upon Defendants'

counsel.  (Docket # 31).  Given these filings, the court finds that Plaintiff put Defendants

on notice of Dr. Smith's testimony for purposes of this summary judgment motion, and

therefore complied with the CMP.

      **B.      Dr. Smith's Qualifications**

Defendants submit that Dr. Smith's qualifications and ability to testify have not

been properly established.  They complain that they were only provided with a small

portion of Dr. Smith's testimony from the hearing on Plaintiff's motion to suppress.  The

docket reflects, however, that Plaintiff provided Defendants with Dr. Smith's CV, which

establishes his qualifications (as discussed above), and with the entire transcript of the

criminal suppression hearing, which includes Dr. Smith's testimony and opinions.  (*See*

Docket ## 30, 31).  Defendants' counsel confirmed receipt of the transcript in a letter to

Plaintiff's counsel dated December 16, 2008.  (*See* Plaintiff's Ex. 4 to Plaintiff's Reply).

In the suppression hearing, Dr. Smith testified that he has held the position of

Director of Occupational Medicine at Community Hospital for 24 years, has practiced

medicine continuously since 1975, and that his specialty requires that he perform

assessments of individuals and determine impairments related to alcohol and drug use.

3

(Dr. Smith Suppression Test. at 6, 8, 9).  Accordingly, the court finds that Dr. Smith is qualified to render an opinion in this case.

### C.      Dr. Smith's Opinions

Defendants contend that Dr. Smith's opinions are "speculative and outrageous." (Defendants' Reply at 3).  Dr. Smith testified that: (1) the medical records indicate that Plaintiff did not present with red/glassy eyes or slurred speech; (2) in his opinion, the toxicology reports and hospital records could not explain why Plaintiff would have exhibited horizontal gaze nystagmus ("HGN"); and (3) in his opinion, the results of Plaintiff's blood test indicate that Plaintiff had not used marijuana for at least twelve hours, and possibly up to three days, prior to the stop.  Dr. Smith also testified about the risks inherent in a forced catheterization.  Dr. Smith's opinions are based upon his knowledge and experience as a practicing occupational medical doctor, and his opinions are relevant to the issues presented.  Accordingly, Defendants' motion to strike this testimony is **DENIED**.

## II.      Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Some

alleged factual dispute that does not rise to a genuine issue of material fact will not alone defeat a summary judgment motion.  *Id*. at 247–48.

In deciding whether a genuine issue of material fact exists, the court views the evidence and draws all inferences in favor of the nonmoving party.  *Miranda v. Wis. Power & Light Co.*, 91 F.3d 1011, 1014 (7th Cir. 1996).  However, when a summary judgment motion is made and supported by evidence as provided in Rule 56(c), the nonmoving party may not rest on mere allegations or denials in its pleadings but "must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e). As this case is before the court on cross motions for summary judgment with respect to all of Plaintiff's claims, the court evaluates each movant's motion under the requirements of Rule 56 stated above.  WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2720 at 23-24 (2d ed. 1990) ("The court must rule on each party's motion on an individual basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard.").

## III.   Factual Background

### A.      The Traffic Stop

1.      On April 26, 2006, at 10:35 p.m., Deputy Drake observed Plaintiff operating his vehicle on U.S. 52 in Rushville, Indiana, in excess of the posted speed limit. Plaintiff was traveling 61 miles per hour in a 40 mile-per-hour zone.  (Defendants' Ex. A, Affidavit of Terry Drake ("Drake Aff.") ¶ 4; Defendants' Ex. Y, Deposition of Terry Drake ("Drake Dep.") at 4-6).

5

2.     Riding as a passenger was Plaintiff's then-girlfriend, Kerrie McMahan Elliott

("Elliott"), who has since married the Plaintiff.  (Defendants' Ex. X, Deposition of

Kerrie McMahan Elliott ("Elliott Dep.") at 4).

3.     Deputy Drake performed a traffic stop.  Both Plaintiff and Elliott had valid driver's

licenses.  (Plaintiff's Ex. 7, Testimony of Terry Drake from the Hearing on the

Plaintiff's Motion to Suppress ("Drake Suppression Test.") at 70).

4.     Deputy Drake did not smell an odor of alcohol or marijuana.  (Drake Dep. at 28).

Deputy Drake alleges, however, that he observed that Plaintiff had mildly slurred

speech, red/glassy eyes, and appeared nervous.  (Drake Aff. ¶ 11).

5.     Plaintiff did not produce a registration for the vehicle, but did produce an undated

title for the vehicle endorsed by the previous owner to Plaintiff.  The license plate

returned to an "Earnest Whitehead" ("Whitehead"), who was also the person who

endorsed the title to Plaintiff.  The vehicle was not reported stolen and was

properly registered to Whitehead.   (Drake Aff. ¶ 8; Drake Dep. at 13; Defendants'

Ex. W, Deposition of Larz Elliott ("Plaintiff Dep.") at 57-58; Drake Suppression

Test. at 67).

6.     Deputy Drake questioned Plaintiff about whether he had insurance on the vehicle.

Plaintiff could not produce proof of insurance on the vehicle.  (Drake Aff. ¶ 10).

Plaintiff stated that he believed that Whitehead's insurance policy was still in force

on the vehicle, since the title and registration had not been transferred, and

Whitehead intended to maintain insurance until he was fully paid for the vehicle.

Plaintiff testified that he believed he was an insured driver.  (Plaintiff's Ex. 8, Testimony of Larz Elliott from the Hearing on the Plaintiff's Motion to Suppress ("Plaintiff Suppression Test.") at 139).  Deputy Drake testified that he had no reason to believe Plaintiff was not insured.  (Drake Dep. at 15).

7.   Deputy Drake continued to question Plaintiff about where he and Elliott were coming from.  Plaintiff explained that they were visiting a friend, Brandon Hoskins ("Hoskins"), to borrow money for gas.  (*Id*. at 20; Plaintiff Dep. at 59-60).  Drake presumed that Plaintiff and McMahan had driven from Fortville, Indiana, to where Hoskins resided, Rushville, because their driver's licenses reflected that they lived in Fortville.  (Drake Dep. at 19).

8.   Because this story seemed suspicious, Deputy Drake stopped writing the ticket and radioed for Officer Brad Reynolds ("Officer Reynolds") of the Rushville Police Department (also known as unit #110), the only canine officer available.  (*Id*. at 24; Drake Suppression Test. at 77).

9.   Deputy Drake did not ask Plaintiff to submit to any field sobriety tests while Plaintiff and Elliott waited in the vehicle.  (Drake Dep. at 40, 43).

10.   Officer Reynolds and Officer Bradley Hatfield ("Officer Hatfield") arrived within twenty to thirty minutes of Deputy Drake's call.  (Plaintiff Dep. at 109).  Deputy Drake estimates that the officers arrived within five minutes of his call.  (Drake Aff. ¶ 15).

11.   The dog indicated on the passenger's and driver's side doors.  (Drake Dep. at 31).

7

12.     Plaintiff and Elliott were asked to get out of the vehicle for the search.  (Plaintiff

Dep. at 61; Elliott Dep. at 37).

13.     Officers Hatfield and Reynolds conducted the search.  (Drake Aff. ¶ 18).

14.     The search produced marijuana seeds and stems on both sides of the car (.01 grams

to be exact), a glass pipe with marijuana residue, Zig-Zag rolling papers, and a

prescription bottle of Vicodin/Hydrocodone, a narcotic.  (Drake Aff. ¶ 19; Plaintiff

Dep. at 65; Defendants' Ex. B, Probable Cause Affidavit ("Probable Cause Aff.");

Defendants' Ex. C, Incident Report ("Incident Report"); Plaintiff's Ex. 4, Indiana

State Police Certificate of Analysis ("Certificate of Analysis")).

15.     Elliott was also concealing another bag of marijuana on her person, which was

later produced during a search at the jail.  (Elliott Dep. at 49-50).

16.     Both denied having illegal drugs in the vehicle.  (Incident Report).

17.     Deputy Drake asked Plaintiff to perform a HGN test at the scene, which, according

to Deputy Drake, Plaintiff failed.  (Drake Aff. ¶ 20; Probable Cause Aff.; Incident

Report).  Deputy Drake admits that a HGN test does not reveal marijuana use.

(Drake Dep. at 42-43; Drake Suppression Test. at 83).

**B.     Deputy Drake Obtains a Search Warrant to Test Plaintiff's Blood or
        Urine for the Presence of Drugs**

18.     Plaintiff refused to give his consent to a chemical test or blood test pursuant to the

Implied Consent law.  (Probable Cause Aff.; Incident Report).

19.     Deputy Drake drove to the home of Judge David Northam ("Judge Northam") with

Plaintiff, presented Judge Northam with a probable cause affidavit, and obtained a signed search warrant for chemical testing at 11:35 p.m. (Drake Aff. ¶ 22; Defendants' Ex. D, Search Warrant ("Search Warrant")). The search warrant provided:

> You are authorized and ordered, in the name of the State of Indiana, with the necessary and proper medical and/or other appropriate health-care professional assistance to obtain and remove a blood or urine sample from [Plaintiff] . . . and to use reasonable force to obtain said sample.

20. After obtaining the signed search warrant, Deputy Drake transported Plaintiff to Rush Memorial Hospital ("Rush Memorial"). (Drake Aff. ¶ 26).

21. The medical records obtained from Rush Memorial reflect that Plaintiff was healthy, awake, and alert. Significantly, the records do not indicate that Plaintiff exhibited red/glassy eyes and mildly slurred speech. (Defendants' Ex. E, Medical Records ("Medical Records") at 7-8; Dr. Smith Suppression Test. at 41).

22. Plaintiff signed a "Consent to Blood Test/Drug Screen" authorizing the hospital to take a "blood sample and/or urine specimen" from him and releasing the hospital from liability. (Medical Records at 5).

23. Plaintiff agreed to submit to the blood and urine tests after Deputy Drake showed Plaintiff the search warrant. (Drake Supression Test. at 98 ("Q: . . . you told him that the Judge had ordered him to submit to a blood test, he told you he would do it, correct? A: Blood, urine, yes, sir. Q: Okay, . . ., but only because the Judge had ordered it, right? A: Well, it's because I had a search warrant.").

9

24.  Plaintiff's blood was drawn in the lab without incident and two vials were
     provided to Deputy Drake and made a part of the "State Kit."  (Drake Suppression
     Test. at 98-99).

25.  Plaintiff drank approximately five cups of water in an attempt to give a urine
     sample over the course of forty-five minutes, but was unsuccessful.  (Plaintiff Dep.
     at 71-72).

### C.    The Medical Catheterization

26.  After failing to produce a urine sample at Rush Memorial, Deputy Drake decided
     to pursue a medical catheterization.  (Drake Dep. at 60 ("So the decision to request
     the catheterization was yours, is that correct?"  A: "Yes, sir."); Plaintiff Dep. at 73
     ("I'm not sure where the catheter came from.  I seen it once before.  [Deputy
     Drake] told me, "If you don't pee in this cup, this is going in.").

27.  Plaintiff testified that Deputy Drake and another officer "were telling [the nurse]
     what to do . . . ."  (Plaintiff Dep. at 79).

28.  The procedure was performed by Nurse Carrie Tressler ("Nurse Tressler"),
     pursuant to an order from Dr. Phil Kingma ("Dr. Kingma").  (Defendants' Ex. L,
     Deposition of Carrie Tressler ("Tressler Dep.") at 14-15; Medical Records at 7).

29.  Before the procedure, Plaintiff was not examined by Dr. Kingma, his medical
     history was not taken, and he was not apprised of the risks inherent to such a
     procedure.  (Drake Dep. at 79-80, 83).

30.  Deputy Drake and Officer Doug Keith ("Officer Keith") handcuffed Plaintiff to

10

the surgical table, pulled his pants down, and held Plaintiff's legs in a spread-eagle position.  (Plaintiff Suppression Test. at 145; Plaintiff Dep. at 76; *see also* Drake Suppression Test. at 114 (testifying that he did not recall whether he handcuffed Plaintiff to the table or not)).  Plaintiff testified, "They were pinning my legs down, yelling at me, telling me to quit screaming, telling me not to cuss at the lady.  Telling me I swear to God this and pinning me down, holding me down while she shoved a catheter in me."  (Plaintiff Dep. at 77).

31.    The procedure was extremely painful, as it required Nurse Tressler to insert a 15 inch catheter up Plaintiff's penis and into his bladder.  (Medical Records at 7-8; Drake Dep. at 74, 76).  Deputy Drake described Plaintiff as "grunting" and "showing pain" as the catheter was inserted.  (Drake Dep. at 75).

### D.    Plaintiff's Blood and Urine are Tested and Plaintiff is Charged with Traffic Offenses

32.    Deputy Drake packaged urine and blood samples for the State Kit, but also provided an additional urine sample to the hospital lab for initial screening. (Drake Aff. ¶ 41; Incident Report).

33.    The urine screen came back at 1:00 a.m., April 27, 2006, showing the presence of THC and benzodiazepines in Plaintiff's system.  (Drake Aff. ¶ 42).

34.    That morning, Plaintiff was charged with Possession of Paraphernalia, Possession of Marijuana, Operating a Motor Vehicle While Intoxicated, and Operating With a Controlled Substance in the Body.  (*Id*. ¶ 43; Defendants' Ex. M, Charging

Information).

35. The reports from the Indiana Department of Toxicology, conducted on May 10 and September 1, 2006, confirm the presence of marijuana and benzodiazepines in his blood. (Defendants' Ex. F, Indiana Department of Toxicology Report; Defendants' Ex. G, Indiana Department of Toxicology Report Amended). No confirmatory tests of Plaintiff's urine were ever performed. (Dr. Smith Suppression Test. at 39).

36. Dr. Smith testified that the metabolites found in Plaintiff's blood indicated he had not used marijuana for at least twelve hours, and possibly up to three days, from when the sample was taken. Thus, the presence of THC in his system would not have caused him to be impaired, have red eyes, slurred speech, or exhibit HGN. (*Id.* at 44).

37. The Indiana State Police laboratory confirmed that 10 grams of a leafy substance found in the vehicle and on Elliott's person was marijuana. (Certificate of Analysis).

### E.   Plaintiff's State Court Proceedings

38. On April 28, 2006, Judge Barbara Harcourt entered an Order Determining Probable Cause. (Defendants' Ex. N, Order Determining Probable Cause).

39. On May 4, 2006, Plaintiff filed a Motion to Enter a Plea of Guilty as to Operating with a Controlled Substance in Body. (Defendants' Ex. O, Plaintiff's Motion to Enter a Plea of Guilty).

40.   On May 8, 2006, Plaintiff was released from jail.  (Plaintiff Dep. at 86).

41.   On July 11, 2006, Plaintiff withdrew his plea of guilty.  (Defendants' Ex. P, Plaintiff's Motion to Withdraw Plea).

42.   On October 11, 2006, the State was granted leave to amend its Charging Information to include an Operating With a Controlled Substance in Body relating to the presence of benzodiazapines in Plaintiff's system.  (Defendants' Ex. R, Amended Charging Information).

43.   Plaintiff filed a Motion to Suppress Evidence, which was denied on March 28, 2007.  (Defendants' Ex. S, Order on Motion to Suppress).

44.   Plaintiff filed a Motion to Correct Errors, which the court granted on May 10, 2007.  The court found that Deputy Drake did not have the authority to impound Plaintiff's vehicle given the facts of the case, and that Deputy Drake had violated Plaintiff's Fourth Amendment rights.  (Defendants' Ex. T, Order Granting Motion to Correct Errors).

## IV.   Discussion

### A.   The Federal Claims

Plaintiff brings his Fourth Amendment claims under Section 1983.  That section provides a private cause of action against a person, who acting under color of state law, deprives an individual of any "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994) (quoting 42 U.S.C. § 1983).  "Section 1983 is not itself a font for substantive

13

rights; instead it acts as an instrument for vindicating federal rights conferred elsewhere." *Spiegel v. Rabinovitz*, 121 F.3d 251, 254 (7th Cir. 1997).

The Fourth Amendment issues presented in this case surround Plaintiff's detention while waiting for the canine unit to arrive, his arrest, and his "forced" catheterization. Specifically, Plaintiff alleges that (1) Deputy Drake exceeded the permissible scope of a lawful *Terry* stop; (2) Deputy Drake did not have probable cause to arrest him; (3) Deputy Drake exceeded the permissible scope of the search warrant issued for Plaintiff's bodily fluids; and (4) Deputy Drake used excessive force in procuring a urine sample through the catheterization. Deputy Drake contends his actions were lawful, and that, at any rate, he is shielded from liability by virtue of qualified immunity. Plaintiff also brings a *Monell* claim against the Sheriff for his alleged policy in providing for forced catheterizations at a deputy's discretion, and for failure to train Deputy Drake as to when a catheterization is a reasonable use of force. The court will begin its discussion with the facts surrounding Plaintiff's traffic stop.

### 1. The Traffic Stop

#### a. Plaintiff's Detention

The Fourth Amendment provides: "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. A roadside traffic stop is a "seizure" within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). A traffic stop is characterized as an investigative detention rather than a custodial arrest. *Berkemer v.*

*McCarty*, 468 U.S. 420, 439 (1984).  As such, a traffic stop is governed by the principles

of *Terry v. Ohio*, 392 U.S. 1 (1968).  Generally, such a stop must be supported by

reasonable suspicion, based upon articulable facts, that criminal activity is afoot.  *Id.* at

21-22.  "'[R]easonable suspicion' is a less demanding standard than probable cause and

requires a showing considerably less than preponderance of the evidence."  *Illinois v.*

*Wardlow*, 528 U.S. 119, 123-24 (2000).  Plaintiff does not challenge the initial traffic stop

of his vehicle for speeding.  Rather, he contends that he was unreasonably and unlawfully

detained in violation of his Fourth Amendment rights until the police canine unit arrived

at the scene.  Deputy Drake responds that the investigatory stop was lawful, and that

qualified immunity shields him from liability.

A canine sniff of the exterior of a vehicle during a traffic stop that is lawful at its

inception and otherwise executed in a reasonable manner does not infringe upon a

plaintiff's Fourth Amendment rights.  *United States v. Martin*, 411 F.3d 998, 1002 (8th

Cir. 2005).  Such a dog sniff may be the product of an unconstitutional seizure, however,

if the traffic stop is unreasonably prolonged before the dog is employed.  *Id.* (citing

*Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).  Once an officer issues a traffic ticket,

warning, or "all clear," the Fourth Amendment applies to limit any subsequent detention

or search.  *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 648 (8th Cir.

1999).  "'[W]ith the purpose of the traffic stop completed, it would be an unreasonable

extension of the scope of the investigation for [the trooper] to further detain [the suspect]

or his vehicle, 'unless something that occurred during the traffic stop generated the

necessary reasonable suspicion to justify a further detention.'" *United States v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001) (quoting *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995)).

In this case, Plaintiff was pulled over for driving 61 miles per hour in a 40 mile-an-hour zone. Deputy Drake testified that he asked to verify Plaintiff's license, registration, and proof of insurance – questions that are within the permissible bounds of a traffic stop. *Jones*, 269 F.3d at 924-25. Although Plaintiff's driver's license was valid, Plaintiff could not produce a valid registration for the vehicle or proof of insurance, and the title he did produce was undated. When Deputy Drake questioned Plaintiff and Elliott as to their whereabouts, Plaintiff explained that they had been to a friend's house to borrow gas money. Plaintiff's response was suspicious to Deputy Drake, as Plaintiff's license indicated that he resided in Fortville, and he was stopped for speeding in Rushville, which is located forty-five minutes from Fortville. These circumstances, coupled with Deputy Drake's observation that Plaintiff had red/glassy eyes, mildly slurred speech, and exhibited a nervous demeanor, led Deputy Drake to believe that illegal drug activity may be afoot, and so he called the canine unit.

Plaintiff cites to evidence that calls Deputy Drake's observations regarding Plaintiff's red/glassy eyes and mildly slurred speech into doubt. For example, Deputy Drake testified that he did not smell an odor of alcohol or marijuana from the Plaintiff. In addition, the medical records from Rush Memorial do not indicate that Plaintiff exhibited red/glassy eyes or slurred speech, even though the records specifically ask for such

information.  Dr. Smith testified that, based upon the results of Plaintiff's blood tests, Plaintiff had not used marijuana for at least twelve hours.  Lastly, Plaintiff cites to the state court's ruling suppressing the evidence in Plaintiff's state court criminal proceeding on the grounds that the detention of the Plaintiff was unreasonable.

Without the evidence of red/glassy eyes and mildly slurred speech, there is room for debate as to whether Plaintiff's nervous demeanor, odd response to Deputy Drake's question regarding his whereabouts, and lack of registration and proof of insurance are enough to expand the scope of a routine traffic stop.  *See United States v. Arvizu*, 534 U.S. 266, 273 (2002) (whether an officer possesses "reasonable suspicion" is a fact-bound inquiry based upon the totality of the circumstances; even individual factors which might otherwise be consistent with innocent behavior can, when taken together, give rise to reasonable suspicion).  The court therefore finds a genuine issue of material fact exists as to whether the facts and circumstances known to Deputy Drake at the time he radioed the canine unit warranted the continued detention of Plaintiff while awaiting that unit, and thus, whether Plaintiff was unreasonably seized within the meaning of the Fourth Amendment.

### b.    Qualified Immunity

Deputy Drake asserts that even if the stop exceeded the permissible bounds of a *Terry* stop, he is shielded from liability by qualified immunity.  A determination of qualified immunity must be made early in the litigation, as "[q]ualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" *Saucier v. Katz*, 533

17

U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  Whether a

defendant is entitled to qualified immunity requires a two-step analysis.  *Id.* at 201.  First,

the court must determine, considering the facts in the light most favorable to the plaintiff,

whether defendant's conduct violated a constitutional right.  *Payne v. Pauley*, 337 F.3d

767, 775 (7th Cir. 2003).  If so, the court must determine whether the right that the

defendant violated was clearly established at the time of the alleged injury.  *Id.*  Although

the privilege of qualified immunity is a defense, Plaintiff carries the burden of defeating

it.  *Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 968 (7th Cir. 2003).

Plaintiff does not respond to Deputy Drake's motion with respect to qualified

immunity.  Plaintiff has therefore failed to show, given the circumstances of his traffic

stop and the information known to Deputy Drake, that Deputy Drake violated a clearly

established right.  Accordingly, Deputy Drake is entitled to qualified immunity with

respect to Plaintiff's claim that his detention while awaiting the canine unit was an

unreasonable extension of the *Terry* stop.  Deputy Drake's motion for summary judgment

on this issue is **GRANTED**, and Plaintiff's cross-motion on this issue is **DENIED**.

### 2.    The Arrest

Plaintiff next challenges his arrest on grounds that Deputy Drake did not have

probable cause to arrest him.  At this juncture, it is important to note that the exclusionary

rule applied in criminal cases does not apply to civil Section 1983 cases.  *Townes v. City

of New York*, 176 F.3d 138, 148 (2d Cir. 1999); *Cannon v. Christopher*, 2007 U.S. Dist.

LEXIS 66146, at *12-15 (N.D. Ind. Sept. 6, 2007); *Ferrell v. Bieker*, 2006 U.S. Dist.

18

LEXIS 7395, at * 20-21 (N.D. Ind. Feb. 3, 2006).  Thus, even if Deputy Drake did not have reasonable suspicion to expand the scope of the search, it would not be error for the court to find that probable cause existed for Plaintiff's arrest.

Probable cause to arrest exists if "the facts and circumstances within [the arresting officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the arrestee was committing or had committed, a crime." *Spiegal v. Cortese*, 196 F.3d 717, 724 n.1 (7th Cir. 1999) (internal quotation marks and citations omitted).  A positive alert by a trained drug dog gives rise to probable cause to search a vehicle.  *United States v. Franklin*, 547 F.3d 726, 735 (7th Cir. 2008); *United States v. Washburn*, 383 F.3d 638, 643 (7th Cir. 2004).  To this end, "the search can go as far as probable cause extends, even into separate containers or the trunk." *Franklin*, 547 F.3d at 735.

In this case, the dog alerted to the passenger's and driver's side doors.  Officer Hatfield and Officer Reynolds searched Plaintiff's vehicle, and discovered evidence of drug activity, including marijuana seeds, stems and rolling papers, a pipe, and a prescription bottle of Vicodin.  There is no evidence that the officers exceeded the scope of probable cause as indicated by the dog.  Accordingly, the court finds that Plaintiff's arrest for Possession of Paraphernalia, Possession of Marijuana, Operating a Motor Vehicle While Intoxicated, and Operating a Motor Vehicle With Controlled Substance in Body were supported by probable cause.  Defendants' motion for summary judgment on this issue is therefore **GRANTED**, and Plaintiff's cross- motion for partial summary

19

judgment on this issue is **DENIED**.

### 3.   The Search and Seizure

Plaintiff raises several issues with respect to his "forced" catheterization.  First, he alleges that the catheterization constituted an illegal search and seizure.  Second, he alleges that Deputy Drake used excessive force against him during the procedure.  Before addressing these issues, the court must first determine whether Deputy Drake violated Plaintiff's constitutional rights by exceeding the scope of the search warrant.

### a.   The Search Warrant

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause . . . particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  "If the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more."  *Horton v. California*, 496 U.S. 128, 140 (1990).

In this case, the search warrant unequivocally gave Deputy Drake the authority to obtain a sample of Plaintiff's blood or urine.  (*See* Search Warrant). Deputy Drake exceeded the scope of the warrant by requiring Plaintiff to give a urine sample after Plaintiff had already provided a blood sample.  Therefore, Deputy Drake's requirement that Plaintiff give a urine sample is per se unreasonable unless an exception to the warrant requirement applies.

There are three exceptions to the warrant requirement that could arguably apply to

the facts of this case.  The first of these is exigent circumstances.  *See Schmerber v. California*, 384 U.S. 757, 770-71 (1966) (finding that an individual suspected of driving while intoxicated may be compelled to submit to a blood test because, *inter alia*, the delay in securing a search warrant, under the circumstances, may have resulted in the destruction of evidence, as blood alcohol levels fall shortly after drinking stops).  Exigent circumstances exist if officers have an objectively reasonable fear that evidence may be destroyed or removed before a warrant can be secured.  *United States v. Rivera*, 248 F.3d 677, 680-81 (7th Cir. 2001).

Here, a warrant was issued for Plaintiff's blood or urine.  Evidence of Plaintiff's possible intoxication was secured by virtue of the blood test.  Thus, this is not a situation where the possible destruction of evidence was at play.  Accordingly, the exigent circumstance exception to the warrant requirement does not apply.

The second exception to the warrant requirement which could arguably apply is search incident to arrest.  This exception provides that law enforcement officers may search the person of an arrestee, and any area into which he might reach in order to grab a weapon or evidentiary items, incident to arrest and without a warrant. *Chimel v. California*, 395 U.S. 752, 762-63 (1969).

Here, the warrantless search of Plaintiff's person was not contemporaneous with his arrest, and thus, was not "incident" to his arrest.  *United States v. Willis*, 37 F.3d 313, 318 (7th Cir. 1994) (finding that a search must be contemporaneous with the arrest to be valid).

21

The third and final exception to the warrant requirement that could arguably apply is a consent search. A consent search is a valid exception to the warrant requirement so long as the consent was freely and voluntarily given. *United States v. McClellan*, 165 F.3d 535, 544-45 (7th Cir. 1999). Conversely, they are invalid if coerced. *Herzog v. Village of Winnetka, Ill.*, 309 F.3d 1041, 1044 (7th Cir. 2002).

Here, Plaintiff signed a Consent Form authorizing the hospital to take a "blood sample and/or urine specimen" from him for purposes of a drug screen. (*See* Medical Records at 5). The Consent Form "authorize[d] the hospital to deliver the results of such test to the appropriate law enforcement officers as part of their criminal investigation." (*Id*.). Deputy Drake testified, however, that Plaintiff only agreed to provide the urine sample because he believed that the search warrant required it. (Drake Suppression Test. at 98). Thus, Plaintiff's voluntary consent[1] is at issue. Accordingly, there exists a genuine issue of material fact as to whether the Consent Form signed by Plaintiff constituted a valid consent to obtain a urine specimen from him, and thus, whether Deputy Drake violated Plaintiff's Fourth Amendment rights.

### b.      Qualified Immunity

The court must next determine whether Deputy Drake is entitled to qualified immunity for exceeding the scope of the search warrant. "A clearly established right is

---

[1]  The issue of consent in this case can be thought of as two subissues: (1) whether Plaintiff consented to providing a urine specimen, and (2) whether that consent extended to a medical catheterization. The Consent Form said nothing about performing a medical procedure to obtain a specimen.

one where the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Jacobs v. City of Chicago*, 215 F.3d 758, 766-67 (7th Cir. 2000) (internal quotations and citations omitted).  If reasonable officials could disagree on the issue, a right is not clearly established.  *Ulichny v. Merton Cmty. School Dist.*, 249 F.3d 686, 706 (7th Cir. 2001) (quoting *Hinnen v. Kelly*, 992 F.2d 140, 143 (7th Cir. 1993)).

As discussed above, the law is clearly established that a law enforcement officer may not exceed the scope of a lawfully obtained search warrant unless one of the exceptions to the warrant requirement apply.  *Horton*, 496 U.S. at 140.  There is a genuine issue of material fact as to whether one of those exceptions, i.e., consent, applies. Accordingly, the court is unable to determine whether qualified immunity applies under the facts presented.

### c.     The Catheterization

Assuming *arguendo* that Deputy Drake did not exceed the scope of the search warrant by requiring the Plaintiff to submit to a urine test, the court must next address whether the *manner* in which Plaintiff's urine was obtained violated Plaintiff's Fourth Amendment rights against unreasonable searches and seizures.  In other words, the court must determine whether the medical catheterization, ordered by Deputy Drake, was constitutionally permissible in the absence of a search warrant specifically authorizing the same.

"The touchstone of the Fourth Amendment is reasonableness."  *Florida v. Jimeno*,

500 U.S. 248, 250 (1991) (internal quotation marks omitted).  This standard applies in the

context of intrusive searches into the body.  *Schmerber*, 384 U.S. at 767-68.  Thus, the

threshold requirements of probable cause and a search warrant issued by an informed and

detached magistrate (unless an exception to the warrant requirement applies) must be

satisfied.  *Id*. at 770 ("The importance of [a search warrant issued by an informed and

detached magistrate] is indisputable and great.").  Beyond these standards, "courts must

weigh a variety of factors to determine whether society's interest in conducting the search

outweighs the individual's interests in privacy and security."  *United States v. Husband*,

226 F.3d 626, 630 (7th Cir. 2000).  Thus, "[n]otwithstanding the existence of probable

cause, a search for evidence of a crime may be unjustifiable if it endangers the life or

health of the suspect."  *Winston v. Lee*, 470 U.S. 753, 761 (1985).  Three cases decided by

the United States Supreme Court serve as helpful guideposts.

In *Rochin v. California*, 342 U.S. 165, 172 (1952), the Supreme Court suppressed

evidence where the police broke into the suspect's house, and, after observing him

swallow capsules, and after trying in vain to forcibly extract the capsules, had his stomach

pumped.  The Court stated, "[W]e are compelled to conclude that the proceedings by

which this conviction was obtained do more than offend some fastidious squeamishness

or private sentimentalism about combatting crime too energetically.  This is conduct that

shocks the conscience.[2]"  *Id*.

---

[2] *Rochin* was decided before the Supreme Court determined that the Fourth Amendment
applied to the states, and thus, was analyzed under the Due Process Clause of the Fourteenth

In *Schmerber v. California*, 384 U.S. 757 (1966), the Supreme Court was faced with the issue of whether the state could compel a drunk driver to submit to a blood test. After considering the facts and circumstances of the case, the Court found that the compelled blood test was reasonable. *Id*. at 771.  The Court first recognized that, because blood alcohol content begins to diminish shortly after drinking stops, the attempt to secure the defendant's blood was a valid exception to the warrant requirement (i.e., an exigent circumstance). *Id*. at 770-71.  The Court also recognized that a blood test is commonplace in today's society, involves little risk, trauma, or pain, and is "a highly effective means of determining the degree to which a person is under the influence of alcohol." *Id*. at 771.  Finally, the Court found, based upon the evidence of record, that the test was performed in a reasonable manner. *Id*.

Finally, in *Winston v. Lee*, 470 U.S. 753 (1985), the Supreme Court considered whether a forced surgical procedure to recover a bullet from beneath the skin of a robbery suspect was reasonable.  In analyzing whether a Fourth Amendment violation had occurred, the Court analyzed the claim under what it termed "the *Schmerber* balancing test," *id*. at 763: "(1) 'the extent to which the procedure may threaten the safety or health of the individual'; (2) 'the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity;' and (3) 'the community's interest in fairly and accurately determining guilt or innocence.'" *Schmerber*, 384 U.S. at 761-62.  After a

---

Amendment. *Husband*, 226 F.3d at 630 n.2.

25

consideration of these factors, the Court found that, although the bullet may provide evidence of the defendant's guilt, the Commonwealth failed to demonstrate a compelling need for the evidence.  *Id.* at 766.  As such, the search was unreasonable.  *Winston*, 470 U.S. at 766 ("The Commonwealth . . . failed to demonstrate that it would be 'reasonable' under the terms of the Fourth Amendment to search for evidence of this crime by means of the contemplated surgery.").

With these three cases in mind, the court now considers the facts and circumstances presented here under the *Schmerber* balancing test.

### 1.    The Extent to Which the Procedure May Threaten Plaintiff's Safety or Health

Dr. Smith testified that a catheterization used to obtain urine should not be utilized unless medically necessary, as inserting a standard "in & out" catheter presents numerous risks, including infection of the urethra, prostate, and bladder.  (Dr. Smith Suppression Test. at 25-26, 56).  Dr. Smith found no evidence in the medical records that Plaintiff was ever examined by a physician, advised of the foreseeable risks, or given any follow up instructions in the event of a complication.  (*Id.* at 29).  Although the insertion of a catheter is not an unusual or particularly dangerous procedure, and was performed by a trained nurse, the court finds, given the fact that Plaintiff had already provided a blood sample, that a material issue of fact exists as to whether the procedure unnecessarily risked Plaintiff's health and safety.

26

### 2. The Extent of the Intrusion Upon the Individual's Dignitary Interests

In the present case, the intrusion into Plaintiff's dignitary interests warrants little discussion.  Plaintiff's pants were pulled down, exposing his genitalia, while a catheter was inserted into his penis.  In addition, the record indicates that Plaintiff did not freely and voluntarily consent to the procedure.  Under these circumstances, Deputy Drake's action of requiring Plaintiff to undergo this procedure constitutes a gross invasion of Plaintiff's liberty interests in personal privacy and bodily integrity.  *See, e.g., Yanez v. Romero*, 619 F.2d 851, 855 (10th Cir. 1980) ("[W]e consider the forceful use of the catheter to obtain a body fluid to be a gross personal indignity.").

### 3. The Community's Interest in Fairly and Accurately Determining Guilt or Innocence

Finally, the court must weigh these factors against the "community's interest in fairly and accurately determining guilt or innocence."  Just as a defendant has a strong interest in being free from an unwanted medical procedure, so too the community has a strong interest in accurate adjudication.  *Husband*, 226 F.3d at 632.

In the present case, before Plaintiff was subjected to a forced catheterization, he voluntarily gave two vials of his blood.  Dr. Smith testified that blood evidence is more reliable than urine, and that, in any event, Plaintiff's urine was never subjected to confirmatory tests.  (Dr. Smith Suppression Test. at 36, 39- 40); *see also Schmerber*, 384 U.S. at 771 (finding that a blood test carries with it a high probability that evidence of guilt will be found).  Thus, the results of Plaintiff's urine were not material to the case

27

against him.  Although Deputy Drake contends that he needed a urine sample because it provides, for example, immediate confirmation of the presence of illegal drugs in Plaintiff's system, Deputy Drake did not have a compelling need for this evidence in order to arrest Plaintiff.  The undisputed evidence reflects that Officer Hatfield and Officer Reynolds found the fruits of drug activity in Plaintiff's vehicle that evening.  Thus, Deputy Drake was already in possession of sufficient evidence to charge Plaintiff with possession of marijuana and possession of paraphernalia.  Moreover, to the extent the results of the blood test contained evidence sufficient to file additional charges against the Plaintiff, the prosecutor in Plaintiff's criminal case could have easily amended the charging information at a later date to reflect that evidence.  Under the facts and circumstances of this case, the government's interest in recovering evidence of possible drugs in Plaintiff's body through the use of a catheter is not strong.

### 4.        Causal Connection

As this is a Section 1983 case, the court must determine Deputy Drake's personal participation in the catheterization procedure.  *See Jenkins v. Keating*, 147 F.3d 577, 583 (7th Cir. 1998) (only those who participate in or cause a constitutional deprivation are subject to Section 1983 liability).  Two cases from other circuits guide the court's analysis.

In *Lovett v. Boddy*, Lovett, the plaintiff, led Boddy, a law enforcement officer, on a high speed chase.  810 F.Supp. 844, 845 (W.D. Ky. 1993).  Lovett eventually wrecked his vehicle.  *Id*.  Boddy arrived at the scene and noticed bottles of alcohol in Lovett's vehicle.

28

*Id.* at 846.  Lovett was transported to a local hospital, whereupon Lovett was subjected to a catheterization for purposes of obtaining a sample of his urine. *Id*. at 845, 848.  The results of Lovett's urine sample, which showed the presence of alcohol in his system at the time of the accident, were admitted at his criminal trial.  *Id*. at 846.  That trial resulted in Lovett's conviction for driving under the influence.  *Id.*

Lovett thereafter filed a Section 1983 action against Boddy.  The district court reasoned that: "[T]he Fourth Amendment's protection of 'human dignity and privacy' might require a warrant at the very least before government officials could compel a citizen to undergo a catheterization." *Id*. at 848.  However, the court concluded that Lovett's Fourth Amendment rights were not violated because, under the facts of the case, there was no evidence that Boddy "caused" Lovett's catheterization.  *Id*. at 848-49.  The court reasoned:

> Plaintiff's evidence regarding Defendant Boddy's role in the catheterization is . . . weak.  Doctor Nell has sworn that he ordered the insertion of the catheter into Plaintiff, that he did so because of medical necessity, and that his order was not influenced by 'any request or order of any law officer.' (Dep. of Nell, conducted by counsel for Boddy, at 4). . . .  Plaintiff's proof, in short, presents no genuine issue of material fact suggesting that Defendant Boddy caused him to be subjected to the catheter's insertion. Defendant Boddy is therefore entitled as a matter of law to judgment with respect to liability arising from Plaintiff's catheterization.

*Id.  See also Rudy v. Village of Sparta*, 990 F.Supp. 924, 929 (S.D. Mich. 1996) (citing *Lovett* for the proposition that a law enforcement officer may not be held liable under Section 1983 for warrantless search where he does not cause the catheterization to take place).

In *LeVine v. Roebuck*, LeVine was a sixty-eight year old prison inmate who was ordered by a correctional officer to give a urine test pursuant to the prison's random drug screening program. 550 F.3d 684, 685 (8th Cir. 2008). LeVine was unable to give a sample due to an enlarged prostate. *Id.* After allowing LeVine over two hours to give a sample, the correctional officer escorted him to the medical unit to be catheterized. *Id.* at 686. Two nurses attempted to catheterize him, and, after their attempts failed, they called for a doctor. *Id.* The doctor instructed them to stop their attempts to catheterize him. *Id.* LeVine suffered pain and an inability to urinate and was transported to a local hospital, where a catheter was successfully inserted. *Id.*

The Eighth Circuit reversed the district court's finding that the correctional officer violated LeVine's Fourth Amendment rights. *Id.* at 689. Central to the Court's finding was the fact that the correctional officer had no involvement with the actual procedure:

> But even if [the correctional officer] ordered LeVine to go to the medical unit, she had no contact with the medical professionals after he arrived and no authority to direct those professionals to undertake the catheterization procedure if they thought it medically inappropriate or if patient LeVine refused to consent. . . . The district court erred in concluding that [the correctional officer] violated LeVine's Fourth Amendment rights because LeVine presented no evidence that [the correctional officer] was personally responsible for any involuntary catheterization that occurred.

*Id.*

These cases teach that a law enforcement officer, who orders a medical catheterization and has personal involvement in the procedure, violates an individual's Fourth Amendment rights.

Here, Deputy Drake testified that the decision to pursue a catheterization on Plaintiff was his.  (*See* Drake Dep. at 60).  In addition, Plaintiff testified that during the procedure, "[the officers] were telling [the nurse] what to do. . . ."  (Plaintiff Dep. at 79).  Moreover, Plaintiff's medical chart, which was signed by Dr. Kingma, provided, "Cath for Urine specimen" under the "Other Orders" section, and "Urine Drug Specimen By Police" under the "Diagnosis" section.  (*See* Medical Records at 7).  However, Nurse Tressler testified that, although she did not speak to Dr. Kingma prior to performing the procedure, she only performed the procedure because Dr. Kingma ordered it.  (*See* Tressler Dep. at 15-16[3]).

Given this conflicting testimony, the court finds that a material issue of fact exists as to the extent of Deputy Drake's involvement in Plaintiff's catheterization.  Unlike *Lovett*, Deputy Drake requested the medical catheterization.  Unlike *LeVine*, Deputy Drake had contact with Nurse Tressler during the procedure.  However, the extent of Deputy Drake's orders, and whether he had the authority "to direct [Nurse Tressler] to undertake the procedure if [she] thought it medically inappropriate," *Levine*, 550 F.3d at

---

[3] Nurse Tressler testified:

Q:      Is it your testimony that you would not have done a catheterization absent a specific and direct order from a physician?

A:      Correct.

Q:      And you don't believe that you did it that night without an order from Dr. Kingma?

A:      Correct.

Q:      But you don't remember whether Dr. Kingma gave you that information either by written order or just verbally?

A:      It's a written order.  It's on the doctor's sheet.

689, remains unanswered.

Balancing the *Schmerber* factors, and to the extent that Deputy Drake "caused" Plaintiff to be subjected to a medical catheterization, the court finds that Deputy Drake violated Plaintiff's Fourth Amendment rights in requiring the Plaintiff to undergo a forced catheterization. The search of Plaintiff's person was intrusive on his personal autonomy. Moreover, the search was not necessary, as any evidence that was obtained from the sample extracted from Plaintiff had already been procured through the blood draw. In sum, the invasion of Plaintiff's privacy interests far outweighs society's interest in his guilt or innocence, and thus, to the extent Deputy Drake "caused" Plaintiff to undergo the procedure, the search and seizure of Plaintiff's urine was unreasonable under the Fourth Amendment. As the extent of Deputy Drake's personal participation in Plaintiff's catheterization is an issue of fact, however, the court must find an issue of fact exists as to whether Deputy Drake violated Plaintiff's Fourth Amendment rights to be free of unreasonable searches and seizures.

### d. Qualified Immunity

Deputy Drake asserts that even if the forced catheterization violated Plaintiff's Fourth Amendment rights, he is entitled to qualified immunity. A court may find a constitutional violation is clearly established "if the violation is so obvious that a reasonable state actor would know that what they are doing violates the Constitution, or if a closely analogous case establishes that the conduct is unconstitutional." *Siebert v. Severino*, 256 F.3d 648  654-55 (7th Cir. 2001). Deputy Drake defends his actions by

32

relying upon two Seventh Circuit cases:  *Sparks v. Stutler*, 71 F.3d 259 (7th Cir. 1995)

and *Sullivan v. Borneman*, 384 F.3d 372 (7th Cir. 2004).  As noted previously, Plaintiff

bears the ultimate burden of proof on this issue, as qualified immunity is "designed to

shield from civil liability all but the plainly incompetent or those who knowingly violate

the law."  *Donovan v. City of Milwaukee*, 17 F.3d 944, 952 (7th Cir. 1994) (internal

quotations and citations omitted).

In *Sparks*, prison guards found a syringe in Sparks' shoe during a prison

shakedown.  71 F.3d at 260.  Sparks claimed that another inmate placed the syringe in his

shoe.  *Id*.  Prison guards then asked for a urine sample, which Sparks claimed he could

not provide.  *Id*.  Finding his story unbelievable, the prison guards escorted Sparks to the

infirmary where the prison physician inserted a catheter up his urethra and extracted urine

from his bladder.  *Id*.  Following a bench trial, the district court judge found that the

forced catheterization violated Sparks' Fourth Amendment rights.  *Id*.

On appeal, the Seventh Circuit, citing to *Schmerber* and *Winston*, described a

catheter as "more intrusive than a needle but less intrusive than a scalpel, making it hard

to classify . . . under an objective reasonableness inquiry."  *Id*. 261.  Without deciding

whether there was a constitutional violation in the case, the Court reversed the district

court's denial of qualified immunity.  *Id*. at 262 ("Legal uncertainty surrounding the use

of invasive medical procedures in prison entitles these defendants to immunity.").

In *Sullivan*, Sullivan was arrested for disorderly conduct.  384 F.3d at 373.  Due to

his high breathalyzer test results, the local jail refused to admit him.  *Id*.  To obtain

clearance, two officers took Sullivan to the emergency room of a local hospital. *Id*. After Sullivan failed to give a urine sample, the emergency room doctor ordered a catheterization. *Id*. At the direction of medical personnel, the officers physically restrained Sullivan during the procedure. *Id*.

Sullivan thereafter brought a Section 1983 claim against the officers, contending that their actions violated his right to be free from an unreasonable search and seizure. *Id*. The district court found that even if the officers were not authorized to restrain Sullivan, the officers were entitled to qualified immunity. *Id*. On appeal, the Seventh Circuit concluded that no constitutional violation had occurred, and thus, did not reach the clearly established prong of the qualified immunity analysis. *Id*. at 377. In finding that no violation had occurred, the Seventh Circuit explained that the officers restrained the plaintiff "at the direction of qualified medical personnel, with the purpose of minimizing injury to [the plaintiff]." *Id*. This, the Court stated, was "entirely reasonable." *Id*.

The court finds that these cases are distinguishable from the present case. In *Sparks*, the plaintiff was a prison inmate at the time of the search of his person. As such, he enjoyed less privacy rights than the Plaintiff. *Id*. at 260; *LeVine*, 550 F.3d at 687 (noting that prison inmates have a lesser expectation of privacy than others in our society). Thus, the balancing test is weighted more in favor of the interests of prison officials in preserving order, discipline, and security. *Spence v. Farrier*, 807 F.2d 753, 755 (8th Cir. 1986). In *Sullivan*, the catheterization occurred only because a licensed medical doctor ordered it; the officers had no involvement in the decision.

The court has conducted its own search for closely analogous case law on this subject, and has not been able to find one in this circuit.  However, "binding precedent is not necessary to establish a right." *Brokaw v. Mercer County*, 235 F.3d 1000, 1022 (7th Cir. 2000); *Donovan*, 17 F.3d at 952 ("In ascertaining whether a particular right has been 'clearly established' . . . this court has not required binding precedent from the Supreme Court or the Seventh Circuit.").  This is because, "in the most extreme cases, an analogous case might never arise because 'the existence of the right was so clear, as a matter of the wording of a constitutional or statutory provision or decisions in other circuits or in the state courts, that no one thought it worthwhile to litigate the issue.'" *Brokaw*, 235 F.3d at 1022 (quoting *Burgess v. Lowery*, 201 F.3d 942, 945 (7th Cir. 2000)).

This case falls into the "obvious" category.  A reasonable law enforcement officer should have known that ordering Plaintiff to submit to a medical catheterization, against his will and without the issuance of a search warrant specifically authorizing the same, was an unreasonable search.

But even if not reasonably obvious, closely analogous cases lead the court to believe that "the recognition of the right by a controlling precedent was merely a question of time." *Donovan*, 17 F.3d at 952.  In support of this proposition, the court cites to *Rochin, Schmerber, Winston, Lovett*, and *LeVine, supra*.  As further support, the court cites to *Adams v. State*, wherein the Indiana Supreme Court held that subjecting a robbery suspect to a surgical procedure to extract a bullet as evidence of the crime, pursuant to a

35

valid search warrant, was an unreasonable search under the Fourth Amendment. 299

N.E.2d 834, 868 (Ind. 1973). Although none of these cases is exactly on point with the

present case, they do show a trend in the case law recognizing the right of all citizens to

be free from unwarranted medical procedures without the benefit of a search warrant

authorized by a detached, neutral judicial officer. *See Schmerber*, 384 U.S. at 770 ("The

importance of informed, detached and deliberate determinations of the issue whether or

not to invade another's body in search of evidence of guilt is indisputable and great.").

Accordingly, the court finds that Deputy Drake is not entitled to qualified immunity.

### 4.      Excessive Force

#### 1.      Constitutional Claim

Plaintiff next contends that Deputy Drake violated his Fourth Amendment rights

through an unreasonable seizure (the catheterization) done with the use of excessive

force. "The question whether the seizure was unreasonable under the Fourth Amendment

depends on whether it was objectively reasonable, judged from the perspective of a

reasonable officer on the scene." *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009)

(citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)); *see also Thompson v. City of*

*Chicago*, 472 F.3d 444, 454 (7th Cir. 2006) ("In order to establish an excessive force

claim under Section 1983, plaintiffs must establish that the state actor's use of force was

'objectively unreasonable' under the circumstances."). In determining whether the

amount of force was excessive, the court "examine[s] the totality of the circumstances to

determine whether the intrusion on the citizen's Fourth Amendment interests was justified

by the countervailing government interests at stake." *Jacobs v. City of Chicago*, 215 F.3d
758, 773 (7th Cir. 2000).  The court considers factors such as "whether the citizen was
under arrest or suspected of committing a crime, was armed, or was interfering or
attempting to interfere with the officer's execution of his or her duties." *Id*.  "In the end,
the excessive force inquiry 'looks to whether the force used to seize the suspect was
excessive in relation to the danger he posed – to the community or to the arresting officers
– if left unattended.'" *Id*. (quoting *McDonald v. Haskins*, 966 F.2d 292, 294 (7th Cir.
1992)).

　　　Plaintiff testified that immediately prior to the procedure, Deputy Drake
handcuffed him to the hospital bed and, with the assistance of another officer, forcibly
held down his wrist and leg (the other officer held down his other wrist and leg) in a
spread eagle fashion.  (Plaintiff Suppression Test. at 145; Plaintiff Dep. at 76).  Plaintiff
further testified that as he screamed in pain, the officers screamed back at him.  (Plaintiff
Dep. at 77).  Deputy Drake testified that he could not recall whether he handcuffed
Plaintiff to the hospital bed.  (Drake Suppression Test. at 114).  He does admit, however,
that even though Nurse Tressler did not ask for his assistance, he did in fact hold
Plaintiff's wrist and leg down during the procedure so that he would not kick Nurse
Tressler.  (*Id*. at 117).

　　　The court finds that a reasonable juror could believe Plaintiff's version of events,
and that handcuffing and pinning him down during the procedure was excessive under the
circumstances.  Plaintiff was not charged with any crime at that point and was not armed.

37

In addition, the facts are not clear as to whether Plaintiff was interfering with the execution of Deputy Drake's lawful duties, or to what extent.  On the other hand, a reasonable juror could believe Deputy Drake's version of events, and that Deputy Drake was merely assisting Nurse Tressler during the procedure so as to prevent injury to her. Accordingly, the court finds that a genuine issue of material fact exists as to whether Deputy Drake violated Plaintiff's Fourth Amendment rights through the use of excessive force during Plaintiff's involuntary catheterization.

### 2.        Qualified Immunity

Deputy Drake asserts that even if he violated Plaintiff's Fourth Amendment rights, he is entitled to qualified immunity.  The court thus turns, once again, to the issue of qualified immunity.

The law is clearly established that an officer may not use excessive force to effect a search, seizure, or arrest.  *Graham*, 490 U.S. at 396; *Jacobs*, 215 F.3d at 773 ("[T]he Fourth Amendment prohibits the use of excessive force during the execution of a seizure.").  Although qualified immunity is an issue of law, here, the underlying facts are in dispute.  Accordingly, the court is unable to determine whether Deputy Drake is entitled to qualified immunity at this time.

### 5.        Monell Liability

Plaintiff also brings two *Monell* claims against the Sheriff.  First, he alleges that the Sheriff had a policy or custom of requiring suspects, who are unable to urinate for purposes of a urine sample, to submit to a forced catheterization.  Second, Plaintiff

alleges that the Sheriff is liable to him for failing to train Deputy Drake.

A municipality may be liable for damages under Section 1983 "if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook County Sheriff's Dept.*, 588 F.3d 445, 453 (7th Cir. 2009) (citing *Monell v. City of New York*, 436 U.S. 658 (1978)).

### a.      Widespread Practice

Plaintiff's first theory of liability fits under the "widespread practice" prong.  "To demonstrate that the [Sheriff] is liable for a harmful custom or practice, the plaintiff must show that [] policymakers were 'deliberately indifferent as to [the] known or obvious consequences.'" *Id*. at 453-54 (quoting *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002)).  Stated differently, "they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Id*.

There is no clear consensus on how often the conduct must occur to constitute a widespread practice.  In *Thomas*, *supra*, the Seventh Circuit noted that "there must be more than one instance, or even three."  *Id*. at 454 (internal quotations and citations omitted); *see also Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006) (citing other cases for the proposition that two or three incidents is not enough to establish a widespread practice).  What is clear, however, is that "[w]hen a plaintiff chooses to

challenge a municipality's unconstitutional policy by establishing a widespread practice, proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference." *Palmer v. Marion County*, 327 F.3d 588, 596 (7th Cir. 2003).

Deputy Drake testified that he has used the forced catheterization procedure on suspects "four or five" times in the past two and one-half years. (Drake Dep. at 61). He testified that although he has never been told this was department policy, he has observed the practice in the past.

> Q:   Who has told you that that is a correct protocol to follow in the event that somebody can't urinate?
>
> A:   That's the only other way I know that you can urinate.
>
> Q:   Well, let me ask you this then –
>
> A:   Nobody has told me.  I've observed it.
>
> *   *   *
>
> Q:   Has anybody in the Rush County Sheriff's Department specifically instructed you that in the event that somebody cannot urinate that you're supposed to obtain a catheterization?
>
> A:   No, sir.  That's the only other way being up at the hospital that a urine draw can be done that I know of.

*Id*. at 59-60.  The subject also arose in Plaintiff's criminal suppression hearing, wherein Deputy Drake testified:

> Q:   And you don't have any specific supervisor or training within the department that's ever told you that that's a use of reasonable force, have you?

40

A:     That's just – That's what I've sat in on and to me that's the policy, so, I mean, I have –

*     *     *

Q:     Whose policy is it?

A:     It's just since I've been on this Department, that's how I've seen it done, so that's how I do it.

(Drake Suppression Test. at 110).

The court finds that Plaintiff has not provided sufficient evidence to raise a genuine issue of material fact as to whether the Sheriff had a widespread practice of allowing its deputies to order suspects catheterized in the event those suspects are unable to give a urine sample through other means.  At most, Plaintiff's evidence reflects isolated instances of misconduct, and not the kind of widespread and pervasive practice required under Seventh Circuit precedent.  *Phelan*, 463 F.3d at 790 ("It is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once.  The plaintiff must demonstrate that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision.").  Although Plaintiff testified that he has "observed it" and "seen it done," he does not specify exactly what he has observed and the circumstances surrounding that observation.  Defendants' Motion for Summary Judgment on this issue is therefore **GRANTED**, and Plaintiff's Motion for Summary Judgment on this issue is **DENIED**.

**b.**     **Failure to Train**

Plaintiff's second theory of liability, based on inadequate training, requires proof of 'deliberate indifference' on the part of the local government.  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) ("We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."); *see also Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029 (7th Cir. 2006).  "This proof can take the form of either (1) failure to provide adequate training in light of foreseeable consequences; or (2) failure to act in response to repeated complaints of constitutional violations by its officers."  *Sornberger*, 434 F.3d at 1029-30 (citing *City of Canton*, 489 U.S. at 390 & n.10).  "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality – a 'policy' as defined by our prior cases – can a city be liable for such a failure under [Section 1983]."  *City of Canton*, 489 U.S. at 389.  In this regard, the Seventh Circuit "requires a high degree of culpability."  *Cornfield by Lewis v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993) ("In order to ensure that isolated instances of misconduct are not attributable to a generally adequate policy or training program, we require a high degree of culpability on the part of the policymaker.").  In sum, to successfully allege a failure to train Monell claim, the policymakers must have "actual or constructive notice that a particular omission is likely to result in constitutional violations."  *Id.*

Plaintiff's failure to train claim is apparently based upon the fact that no one –

42

including a judge or someone in the Sheriff's Department – informed Deputy Drake that

ordering a catheter on a suspect was an reasonable (or unreasonable) use of force.

Q:     Is it your opinion that using a catheter is reasonable force?

A:     Yes.

Q:     Who's given you that training?  Who's told you that?

*    *    *

Q:      . . . I'm asking you have you ever been told by anybody, a member
       of the prosecutor's office, a member of the judge's staff, the judge,
       anybody in your department, that it is a use of reasonable force to
       insert a catheter into somebody?

A:     No.

(Drake Dep. at 60-61).

Failing to inform a deputy that catheterizing a suspect is a reasonable/unreasonable

use of force does not seem to fit into a failure to train scenario, and certainly fails to

establish *Monell* liability against the Sheriff.  Indeed, there is absolutely no evidence of

culpability on the part of the Sheriff, and no evidence that this failure to inform caused

Plaintiff's injury.  In the absence of this essential evidence, Plaintiff's failure to train

*Monell* claim fails as a matter of law.  Defendants' Motion for Summary Judgment on this

issue is therefore **GRANTED**, and Plaintiff's Motion for Summary Judgment on this

issue is **DENIED**.

**B.     State Law Claims**

The court now turns to Plaintiff's state law claims for battery, false arrest, and

false imprisonment.

### 1.      False Arrest and False Imprisonment

The Indiana Tort Claims Act ("ITCA") provides immunity from liability to governmental employees acting within the scope of their employment if a loss results from "[t]he adoption and enforcement of or failure to adopt or enforce a law . . . unless the act of enforcement constitutes false arrest or false imprisonment." IND. CODE § 34-13-3-3(8).  Under Indiana law, "[a] defendant may be liable for false arrest when he or she arrests the plaintiff in the absence of probable cause to do so." *Miller v. City of Anderson*, 777 N.E.2d 1100, 1104 (Ind. Ct. App. 2002).   Indiana law defines an "arrest" as "the taking of a person into custody, that he may be held to answer for a crime." IND. CODE § 35-33-1-5.  An investigatory stop does not constitute an arrest under the Indiana definition of arrest.  *James v. State*, 622 N.E.2d 1303, 1307 (Ind. Ct. App. 1993).

In this case, Plaintiff alleges that he was arrested without probable cause.  As discussed in Section IV.A.1.a., *supra*, the detainment during the search was an investigatory stop, not an arrest.  As discussed in Section IV.A.2., *supra*, Defendants had probable cause to arrest Plaintiff for possession of a controlled substance when they found marijuana seeds, a pipe, and rolling papers in his vehicle.  Therefore, Defendants' actions did not constitute false arrest under Indiana law at either point in time. Defendants' motion for summary judgment is **GRANTED** and Plaintiff's motion for summary judgment is **DENIED** with respect to Plaintiff's state law claims of false arrest and false imprisonment.

44

### 2.     Battery

The Indiana Supreme Court has held that the ITCA does not immunize police officers in excessive force cases from liability for assault and battery. *Kemezy v. Peters*, 622 N.E.2d 1296, 1297 (Ind. 1993).  The Court reasoned that law enforcement officers, under Indiana law, owe a private duty to refrain from using excessive force when making arrests.  *Id.*  This court has held that although the Indiana Supreme Court seems to have abandoned the public/private duty distinction in *Benton v. City of Oakland City*, 721 N.E.2d 224, 230 (Ind. 1999), the Court has not expressly overruled *Kemezy*.  *Phelps v. City of Indianapolis*, 2004 WL 1146489, at \*14 (S.D. Ind. May 10, 2004).  Further, this court refused to predict that the Indiana Supreme Court would overrule *Kemezy*; thus, it is still good law.  *Id.*

Because the court finds that there is a genuine dispute of fact as to whether Defendants' use of force in "searching" Plaintiff was excessive, the court is precluded from finding that Defendants are entitled to immunity under the ITCA for battery.  As such, both Defendants' and Plaintiff's summary judgment motions are **DENIED** on Plaintiff's claim for battery.

### V.     Conclusion

For the foregoing reasons, the court **DENIES** Defendants' motion for summary judgment (Docket # 48) with respect to Plaintiff's Fourth Amendment claims for unlawful arrest, search and seizure, and excessive force, and with respect to Plaintiff's state law claim for battery, but it **GRANTS** Defendants' motion with respect to Plaintiff's

45

Section 1983 *Monell* claims and state law claims for false arrest and false imprisonment.

The court **DENIES** Plaintiff's motion for summary judgment (Docket # 54) in its

entirety.


**SO ORDERED** this <u>22nd</u> day of February 2010.


RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronic copies to:

Todd Eric Ess
TODD ESS
todderic@comcast.net

Stephen G. Gray
ATTORNEY AT LAW
misstuffy@aol.com

Kirk A. Horn
MANDEL HORN MCGRATH & REYNOLDS, P.C.
khorn@mhmrlaw.com